FILED
RICHARD W. NAGEL
CLERK OF COURT

3/20/25

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
WEST. DIV. DAYTON

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** Plaintiff, v. **JACK A. PATTON,** Defendant. | CASE NO.  3:25-cr-24<br>JUDGE  Walter H. Rice<br>INFORMATION<br>18 U.S.C. §§ 1341 & 2 |

THE UNITED STATES ATTORNEY CHARGES:

<u>COUNT 1</u> (Mail Fraud)

[18 U.S.C. § 1343]

I.  INTRODUCTION

1. During at least the approximate period of January through December 2020 (the "Relevant Period"), Defendant Jack A. Patton knowingly engaged in a scheme to defraud his long-time employer ("Company A") and enrich himself by inducing Company A to make approximately $220,000 in pointless software purchases on which he was secretly making commissions that were sent to him or his designee through the U.S. Mail.

2. Company A is a large technology company that offers products and services in the geospatial sector, among others. As part of its business, Company A and its subsidiaries provide technology solutions to governmental entities, including the U.S. Department of Defense ("DOD") and its components, such as the U.S. Air Force ("USAF"). One product that Company A offers is software allowing land surveyors to import, view, and utilize field data. This software is currently available for download on Company A's website.

3. Patton worked for Company A in its Dayton offices for around three decades until his retirement from the organization in 2023. During his tenure at Company A, Patton held several positions, including Director of Federal Military Products. In this capacity, Patton was responsible for running Company A's DOD portfolio and overseeing sales to defense customers. As a function of his role, Patton had signing authority in the amount of $5,000 – meaning he had the power to obligate Company A to pay invoices of up to $5,000 without securing sign-off from a higher-level supervisor.

4. Company B is a technology company that offers its own land surveying software, which is generally comparable to, and directly competes with, Company A's. Several versions of Company B's land surveying software are currently available for download through Company B's website.

5. Unbeknownst to his employer Company A, during the Relevant Period, Patton was simultaneously engaged as a software sales representative of Company B.[1] Under his arrangement with Company B, Patton would be compensated by commission for selling Company B's software, giving rise to an obvious conflict of interest in light of Patton's employment with Company A.

II. THE SCHEME TO DEFRAUD

6. During the Relevant Period, Patton knowingly and intentionally engaged in a fraud scheme to deprive Company A of money by causing it to pay needlessly for copies of Company B's software so that Patton could illicitly earn commissions as a software sales representative of Company B.

7. Patton's scheme to defraud was built on a basic but clever deception: relying on his $5,000 signing authority and on doctored invoices that he submitted to Company A's accounts

---

[1] At some point, Patton became a shareholder of Company B.

payable department, Patton pretended to be approving transactions through which Company A was supplying Company B's land surveying software to the USAF under existing contracts. In reality, Patton was merely causing Company A to pay for unneeded copies of Company B's software that were never provided to real government customers through Company A (and for which Company A was never compensated).

8. As part of the scheme, Patton, using his Company A email address, would contact Company B to request individual "seats" (*i.e.*, licenses for a single user) of Company B software, purportedly for use by military customers. For each requested software seat, Company B would email Patton an electronic invoice in the amount of $8,840 at his Company A email address. The invoices that Company B emailed to Patton typically contained very little information and did not name or specify the military users to whom the Company B software was supposedly being provided.

9. By way of example, on or about March 31, 2020, Company B sent Patton invoice 20-CHG356 for a single seat of Company B software in the amount of $8,840. Beyond the word "Invoice" and Company B's name, logo, mailing address, and phone number, the bare-bones bill contained only information related to the quantity, description, and price of the software allegedly being sold and the total amount due, as shown in the redacted excerpts below:

| Item # | Quantity | Description | Price Each | Amount |
|---|---|---|---|---|
| | 1 | Military Version 8.0 Software License (Civil/Survey/GIS software) | 7,995.00 | 7,995.00 |
| | 1 | Support for Item #1. One year provided by ▮. | 845.00 | 845.00 |

**Total Due**     $8,840.00

3

10. After receiving invoices from Company B, Patton would generate doctored and manipulated versions of the billing documents – containing material misstatements – so that he could more easily submit them to Company A's accounts payable department without anyone catching on to his scheme. As a first step, Patton would fraudulently cleave each $8,840 invoice into two smaller invoices, creating an "A" version and a "B" version, each in the amount of $4,420. In other words, for each software invoice he received from Company B, Patton would generate two, effectively transforming a single purported sale for $8,840 into two purported sales for $4,420 and $4,420. By splitting the invoices (and thus further materially misrepresenting the number of purported sales), Patton ensured that the fake bills slid in under his approval limit of $5,000, effectively allowing him to greenlight the invoices for payment himself.

11. For example, after receiving invoice 20-CHG356 on or about March 31, 2020, Patton transformed it into invoices 20-CHG365A and 20-CHG356B.[2] As shown in the redacted excerpts below, each of these two new invoices purportedly related to a single seat of Company B software. The "A" invoice included the following:





---

[2] In the "A" version, Patton transposed the "5" and the "6" in the invoice number.

4

Similarly, the "B" invoice included the following information:





These fraudulent "A" and "B" versions of the original invoice were fundamentally and materially false and misleading because the two alleged sales reflected in the bifurcated documentation were not real and genuine transactions. Indeed, Company A did not make even a single sale to the USAF in connection invoice 20-CHG356, let alone two.[3]

12. In addition to splitting the invoices, Patton would manipulate and annotate them to amplify the illusion that they related to actual sales to military customers (when, in fact, they did not). To that end, Patton made the following modifications, among others, to one or more invoices:

a. Patton inserted recipient address information specifying that Company B software would be shipped to certain USAF personnel at specified facilities (when, as

---

[3] When splitting invoice 20-CHG356, Patton also altered the description of the product allegedly being sold. Whereas the original invoice from Company B purportedly related to the sale of a "Military Version 8.0 Software License," the "A" and "B" invoices asserted that Company B was providing a "Military Advanced Version 10.6 Software License" and a "Military Advanced Version 10.6.1 Software License," respectively.

5

Patton was aware, the software was not actually delivered to the address in question, and the listed personnel were fabricated and therefore not the intended recipients).

       b.      Patton made handwritten notes detailing purported communications with – as well as efforts to contact – particular USAF personnel regarding the sale and delivery of Company B software (when, as Patton fully knew, he never engaged in any such attempted or actual communications, and the supposed military points of contact were spurious).

       c.      Patton added language indicating that Company B software was being sold by Company A to the USAF under a contract "issued by the [USAF] direct to [Company A] and supported by [Company B]" (when, as Patton was aware, Company A was not actually selling the software to the USAF, but rather merely paying for it).

In modifying the invoices in this manner, Patton made material misrepresentations – and concealed critical facts – in order to defraud Company A into paying for Company B software for which it had no need and would never be reimbursed.

    13.    As an example, per the redacted excerpts below, Patton knowingly introduced multiple material misrepresentations into invoice 20-CHG365A.

       a.      First, Patton included the following spurious shipping information, which indicated that the seat of Company B software referred to in the invoice was being sent to USAF Staff Sergeant (or "SSgt") T.H. in Oklahoma:



This shipping information was false and misleading because, among other things, (i) T.H. was not a real USAF Staff Sergeant and (ii) a seat of Company B software was not actually shipped to the 137th Civil Engineer Squadron of the Oklahoma Air National Guard.

      b.      To enhance the convincingness of the fraud, Patton applied materially false and misleading annotations to invoice 20-CHG365A to create the false impression that he had engaged in a series of communications with Staff Sergeant T.H. (who did not exist). These handwritten annotations included notes about leaving voicemails and confirming receipt of the seat of Company B software:



Patton's notes – made to resemble a log of good-faith efforts to communicate with an actual customer – were materially false and misleading because Patton undertook no such efforts, the alleged military contact was fictional, and the purported transaction was a sham.

7

c.  Finally, Patton applied a deceptive footer to invoice 20-CHG365A claiming that Company B software was being sold through Company A to the USAF under a contract between Company A and the USAF:



This materially misleading language created a mirage of legitimacy and regularity vis-à-vis the purported transaction when, in fact, the sale was bogus.

14. After creating materially misleading split invoices, Patton would submit them to Company A's accounts payable department, resulting in payments by Company A to Company B. Among the invoices that Patton submitted for payment were 20-CHG365A and 20-CHG356B, which he emailed to accounts payable on or about May 7, 2020 and which were paid by on or about May 20, 2020. In total, based on his conduct during the Relevant Period, Patton fraudulently induced Company A to pay around $220,000 in invoices related to Company B software.

15. Once Company A paid Company B, Patton would receive a commission check from Company B through the U.S. Mail. The check would be sent either to Patton or to his designee. In this manner, Patton succeeded in obtaining a portion of the money for himself. Over the course of the Relevant Period, Patton illicitly secured around $41,150.00 in fraud proceeds in the form of commissions from Company B. This amount included around $1,679.60 in commission on invoice 20-CHG356 (*i.e.*, invoices 20-CHG365A and 20-CHG356B), as shown in the redacted check image below:



16. In summary, over the course of the Relevant Period, Patton, acting with intent to defraud, knowingly engaged in a scheme to deprive Company A of money through the submission of falsified invoices containing material misstatements and omissions.

III. THE MAILING

17. On or about the date listed below, in the Southern District of Ohio, Defendant Jack Patton, for the purpose of executing and in furtherance of the scheme described above, used and caused another to use the U.S. Mail to send and receive a commission check.

| COUNT | DATE | COMMUNICATION |
|---|---|---|
| ONE | May 21, 2020 | Commission Check |

All in violation of 18 U.S.C. §§ 1341 and 2.

KELLY A. NORRIS
ACTING UNITED STATES ATTORNEY

/s/ George Painter
GEORGE PAINTER (0097271)
ELIZABETH L. MCCORMICK (0087862)
Assistant United States Attorneys